**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**RAY and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 25, 2018**

# In the Court of Appeals of Georgia

A18A0860. HOMELIFE ON GLYNCO, LLC et al. v. GATEWAY CENTER COMMERCIAL ASSOCIATION, INC.

RICKMAN, Judge.

Gateway Center Commercial Association, Inc. (the "Association") sued Homelife on Glynco, LLC and Homelife Companies, Inc. (collectively, "Homelife") for failure to pay assessments allegedly owed under a Declaration of Covenants, Conditions and Restrictions. The parties filed cross motions for summary judgment, and the trial court granted the Association's motion for summary judgment in part, denied it in part, and denied Homelife's motion for summary judgment. Homelife appeals, contending that the trial court erred in determining that its properties were properly annexed into the Association, failing to find that two of its lots were not subject to assessment, failing to find that the assessments were invalid, and failing to

grant summary judgment on the Association's claim for unjust enrichment. For reasons that follow, we affirm in part and reverse in part.

Summary judgment is warranted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). "On appeal from the grant or denial of summary judgment, we conduct a de novo review, with all reasonable inferences construed in the light most favorable to the nonmoving party." (Citations and punctuation omitted.) *Smith v. Found*, 343 Ga. App. 816, 817 (806 SE2d 287) (2017).

The record shows that the Association was organized in November 1995 to manage and oversee an association of commercial properties located in a planned business district along the Glynco Parkway Corridor, in accordance with a Declaration of Covenants, Conditions and Restrictions for Gateway Center Commercial Properties (the "Declaration"). As part of its role in managing and overseeing the properties, the Association assesses and collects quarterly dues.

The Declaration was recorded in the Glynn County, Georgia property records in November 1995. Pursuant to the terms of the Declaration, the property described in Exhibit A thereto and any additional property subjected to the Declaration by Supplemental Declaration was subject to the easements, restrictions, covenants and

conditions set forth in the Declaration, including the obligation to pay assessments levied by the Association. Exhibit B to the Declaration described property that was subject to annexation, which included the properties now owned by Homelife.

Pursuant to Article X of the Declaration,

> until all property described in Exhibit "B" has been subjected to this Declaration or 50 years after the recording of this Declaration, whichever is earlier, Declarant may unilaterally subject to the provisions of this Declaration all or any portion of the real property described in Exhibit "B. . . . Such annexation shall be accomplished by filing a Supplemental Declaration describing the property to be annexed in the Official Records.[1] Such Supplemental Declaration shall not require the consent of Members [of the Association], but shall require consent of the owner of such property, if other than Declarant.

A Supplemental Declaration is defined as "an instrument filed in the Official Records pursuant to Article X which subjects additional property to this Declaration." Official Records are defined as "the Office of the Clerk of the Superior Court of Glynn County, Georgia, or such other place which is designated as the official location for recording of deeds and similar documents affecting title to real estate."

---

[1] Annexation in this context refers to the process whereby property is annexed to or subjected to the Declaration.

U. C. Realty Corp. was the initial Declarant under the Declaration and served as Declarant from 1995 to 2003, when it assigned its status as Declarant to HRB, LLC. In October 1996, U. C. Realty Corp. conveyed Lot 2A in the Gateway Center development to Fairhaven Assisted Living Center, L.P., and Lots 2B and Lot 2C to Fairhaven Eldercare, L.L.C. via limited warranty deeds that were recorded in the Glynn County, Georgia property records. Lots 2B and 2C were ultimately conveyed to Fairhaven Assisted Living Center, L.P. ("Fairhaven"). Each deed stated that

> [t]his conveyance is subject to that Declaration of Covenants, Conditions and Restrictions of Gateway Center Commercial Properties, dated November 8, 1995, recorded in the Office of the Clerk of the Superior Court, Glynn County, Georgia, . . . together with those Gateway Center Development Guidelines dated November 9, 1995, promulgated pursuant thereto, as same may be amended from time to time."

According to Ricky Mitchell, the current president of the Association, subsequent to this conveyance, Fairhaven paid quarterly dues to the Association for over fifteen years and participated in regular Association meetings.

In June 2013, Fairhaven's owner passed away and her relatives sought a buyer for the assisted living facility. Don Rankey, President and CEO of Homelife Companies, Inc. and manager of Homelife on Glynco, LLC, entered into discussions

with the former owner's relatives. Fairhaven and Homelife ultimately entered into an asset purchase agreement and a management agreement so that Homelife could manage the facility prior to completing the asset purchase. On October 23, 2013, Fairhaven executed two warranty deeds – one conveyed Lot 2A of the Gateway Center to Homelife on Glynco, LLC and one conveyed Lots 2B and 2C of the Gateway Center to Homelife Companies, Inc. Both deeds stated that "[t]his conveyance and the warranties herein contained are expressly made subject to those liens, encumbrances, restrictions and other matters set forth on Exhibit "B" attached hereto and incorporated herein by reference." The Declaration was listed as a permitted exception on Exhibit B to both deeds.

After this transaction, the Association continued to send quarterly invoices for assessments to the local address for both Homelife entities. Homelife did not pay the invoices, some of which were refused and returned to sender. In October 2014, the Association sued both Homelife entities for breach of contract for failing to pay assessments, and, in the alternative, unjust enrichment, seeking to recover the unpaid assessments, interest, and attorney fees. The Association also asserted a lien foreclosure claim against Homelife on Glynco. Homelife answered and asserted a counterclaim for breach of contract based on the Association's alleged lack of

maintenance, failure to maintain the common area, failure to provide proper notice of meetings, taking corporate action at meetings without proper authority, and improperly calculating assessments. Homelife on Glynco also asserted a claim for slander of title.

Following discovery, Homelife moved for summary judgment. The Association filed a cross-motion for partial summary judgment, seeking a ruling that the Homelife properties have been annexed into the Association and are subject to assessment, dismissing Homelife's slander of title claim, and dismissing Homelife's claim for attorney fees. The trial court determined that all of the lots owned by Homelife were subject to the Declaration, which requires the payment of assessments. The trial court further determined that "the remaining issues on which summary judgment has been sought are not ripe for summary adjudication at this time," and stated that "[b]ecause there is a potential for offsetting claims for attorney fees, the Court will defer consideration of that issue until the conclusion of the case." Homelife appeals from that order.

1. Homelife contends that the trial court erred by misinterpreting the language of the U. C. Realty deeds and concluding that they constituted a Supplemental Declaration that annexed the Homelife properties into the Association. Homelife

6

argues that the language in the U. C. Realty deeds stating that "this conveyance is subject to th[e] Declaration" is ambiguous and merely provided notice that the Homelife properties were subject to being annexed into the Association, pointing out that the deeds do not specifically state that the Homelife properties are being annexed.

To construe the Declaration and the U. C. Realty Corp. deeds, we apply the normal rules of contract construction and our application of those rules is de novo.[2] See *Crabapple Lake Parc Community Assn. v. Circeo*, 325 Ga. App. 101, 104-105 (1) (a) (751 SE2d 866) (2013)*; Nesbitt v. Wilde*, 306 Ga. App. 812, 813 (703 SE2d 389) (2010).

> The cardinal rule of construction is to ascertain the intent of the parties. Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties. To determine the intent of the parties, all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred. When the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation the language used must be

---

[2] As a result, we need not address Homelife's contention that the trial court misapplied the rules of contract construction to the Declaration and the U. C. Realty Corp. deeds. See *Crabapple Lake Parc Community Assn. v. Circeo*, 325 Ga. App. 101, 104 (1) (751 SE2d 866) (2013).

7

afforded its literal meaning and plain ordinary words given their usual significance.

(Citation and punctuation omitted.) *Crabapple Lake*, 325 Ga. App. at 105 (1) (a); see also *S-D RIRA, LLC v. Outback Property Owners' Assn.*, 330 Ga. App. 442, 453 (3) (c) (765 SE2d 498) (2014) ("If the manifest intent of the parties can be ascertained from the covenants as a whole, no ambiguity exists, and there is no need for judicial construction.") (citation and punctuation omitted).

Pursuant to Article X of the Declaration, annexation of all or any portion of the real property described in Exhibit B to the Declaration shall be accomplished by the Declarant filing a Supplemental Declaration describing the property to be annexed in the Official Records. A Supplemental Declaration is an instrument filed in the Official Records pursuant to Article X that subjects additional property to the Declaration. While serving as the Declarant, U. C. Realty Corp. conveyed its ownership interests in Lots 2A, 2B, and 2C to Fairhaven via two limited warranty deeds. Although not titled a "Supplemental Declaration," the U. C. Realty Corp. deeds contain all of the required elements for a Supplemental Declaration – the deeds state that the conveyances described therein are subject to the Declaration, contain

8

property descriptions of each lot conveyed, and were filed in the Glynn County, Georgia property records.

Homelife contends that the reference to the Declaration in the U. C. Realty Corp. deeds is ambiguous and could be construed to mean that the property is not actually subject to the Declaration, but subject to future annexation. We disagree.

"Because few titles are absolutely perfect, a warranty deed typically includes a 'subject to' clause and specifies encumbrances that will not be cured or defended by the grantor." *Great Water Lanier, LLC v. Summer Crest at Four Seasons on Lanier Homeowners Assn.*, 344 Ga. App. 180, 187 (1) (811 SE2d 1) (2018). "[T]he usual and common meaning of [such] terms as used in warranty deeds controls our analysis." Id. When the lots were owned by U. C. Realty Corp., they were property that could be subjected to the Declaration by Supplemental Declaration. When U. C. Realty Corp., as Declarant, conveyed the lots to Fairhaven, it expressly made the conveyances "subject to" the Declaration, which meant the lots were to be held, sold, and conveyed subject to the easements, restrictions, covenants, and conditions set forth therein. On this issue, we discern no ambiguity in the deeds and therefore "confine ourselves to the four corners of the document to ascertain the parties' intent." Id.

9

Fairhaven accepted deeds that expressly made its interests in the conveyed property subject to the terms of the Declaration and the development guidelines. "By accepting a deed with covenants and restrictions, the grantee consents to be bound by such covenants and restrictions." *Interchange Drive, LLC v. Nusloch*, 311 Ga. App. 552, 557 (716 SE2d 603) (2011); see *Great Water Lanier*, 344 Ga. App. at 188 (by accepting deed that unambiguously conveyed the parcel subject to the declaration of covenants, Great Water voluntarily consented to be bound by such covenants). The fact that the deeds did not contain the terms "Supplemental Declaration" or "annexation" did not render the Declaration inapplicable to Homelife's predecessor in title. See *Interchange Drive*, 311 Ga. App. at 556 (failure to follow exact wording used to define a supplemental declaration did not render Covenants inapplicable).

Fairhaven's subsequent conveyance of the lots to Homelife was also made subject to the Declaration because a grantor in a deed can convey only that which it owns and a grantee takes no greater title than that held by the grantor. See *Great Water Lanier*, 344 Ga. App. at 186 (1); *Interchange Drive*, 311 Ga. App. at 557. In addition, the deeds from Fairhaven to Homelife expressly stated that the conveyances were subject to the Declaration. Accordingly, the trial court properly determined that

10

the Homelife properties are subject to the easements, restrictions, covenants, and conditions set forth in the Declaration.

2. Homelife contends that the trial court erred in determining that Fairhaven's consent to the alleged annexation was not required to be in writing. Homelife relies on OCGA § 44-5-60 (d) (4), which provides that "[n]otwithstanding any other provision of this Code section or of any covenants with respect to the land, no change in the covenants which imposes a greater restriction on the use or development of the land will be enforced unless agreed to in writing by the owner of the affected property at the time such change is made."

This code section is inapplicable here because, contrary to Homelife's arguments, the deeds conveying the lots to Fairhaven did not change the covenants with respect to the land after Fairhaven acquired it, but merely applied the existing covenants when the property was conveyed to Fairhaven. Cf. *Charter Club on River Home Owners Assn. v. Walker*, 301 Ga. App. 898, 900 (689 SE2d 344) (2009) (Because amendment to declaration of protective covenants prohibits a specific use of the property that was specifically within homeowner's ownership rights when she purchased the property and homeowner did not consent to amendment, OCGA § 44-5-60 (d) (4) renders the amendment inapplicable to homeowner). Further, it is well

11

settled that "'[w]hen a grantee accepts a deed, he is bound by the covenants contained therein even though the deed has not been signed by him.'" *Great Water Lanier*, 344 Ga. App. at 186 (1), quoting OCGA § 44-5-39. Thus, Fairhaven's consent to the annexation was not required to be in writing.

3. Homelife contends that the trial court erred by concluding that Lots 2B and 2C are assessable under the Declaration. Homelife argues that the lots are undevelopable and therefore not subject to assessment.

Pursuant to the Declaration, the Association is authorized "to levy assessments against each Parcel for Association expenses as the Board may specifically authorize from time to time." "Parcel" is defined as

> a portion of the Properties, whether improved or unimproved, which may be independently owned and conveyed and which is intended for development, use and occupancy for purposes consistent with this Declaration, any other covenants, and applicable zoning. The term shall refer to the land, if any, which is part of the Parcel as well as any improvements thereon. . . . If any Parcel is subdivided or resubdivided, whether by plat or deed, each such subdivision shall be considered a Parcel and votes and liability for assessments shall be recomputed for each subdivision. . . .

"Properties" includes "the real property described in Exhibit "A," together with any such additional property as annexed to this Declaration." Assessment obligations under the Declaration are based on the number of "Equivalent Units" assigned to a particular Parcel relative to all other Parcels subject to a particular assessment. For each Parcel, Equivalent Units are derived by ascertaining the number of square feet of usable land for development and the square footage of any enclosed structures.

Parcel CR4 of the Gateway Center development includes Lots 2A, 2B, and 2C. Homelife contends that none of the property in Lots 2B and 2C is usable land for development and is therefore not subject to being assessed. Homelife relies on the deeds in the chain of title and an affidavit from Jimmy Hudspeth, an architect hired by Homelife to prepare a preliminary site plan for a possible addition to the facility on Lot 2A. The deeds conveying Lots 2B and 2C from U. C. Realty Corp. to Fairhaven contain a restriction – "no improvements may be erected upon or placed upon this property for a period of 20 years from the date of this conveyance." That restriction is repeated in subsequent deeds in the chain of title dated January 2000 and March 2008, each time adding a new 20-year period. The conveyance of Lots 2B and 2C from Fairhaven to Homelife is subject to the reservations and restrictions contained in those January 2000 and March 2008 deeds. According to Hudspeth, Lots

13

2B and 2C consist primarily of a lake and property controlled by the U. S. Army Corp of Engineers, or wetlands, and are therefore not developable.

The Association responds that Lots 2B and 2C consist primarily of wetlands controlled by the U. S. Army Corp of Engineers and approximately 14,721 square feet of developable land, and that it has consistently assessed Fairhaven and Homelife based on 188,963 square feet of usable land (174,242 for Lot 2A and 14,721 for Lots 2B and 2C) and 32,600 square feet for the structure on Lot 2A. According to Mitchell, the Association has never assessed wetlands, ponds, lakes or anything under the control of the Army Corp of Engineers.

The trial court granted summary judgment to the Association on its claim that a portion of Lots 2B and 2C are subject to assessment, concluding that covenants applicable to property cannot be evaded by subdividing the property and obtaining separate deeds for the parcels. Homelife did not, however, subdivide the property; it merely divided ownership of the lots between two entities. The trial court erred in granting summary judgment to the Association on this claim. An issue of fact remains as to whether any portion of Lots 2B and 2C in Parcel CR4 can be considered usable land for development and therefore subject to assessment under the Declaration.

14

4. Homelife contends that the trial court erred in failing to find that the assessments at issue were invalid. Homelife argues that the Board was improperly appointed without a quorum and cannot issue valid assessments, and that any actions taken at meetings for which proper notice was not given are void and unenforceable.

The Board of Directors is responsible for administration of the Association. Pursuant to the Declaration, the Class "B" member is entitled to appoint a majority of the members of the Board during the Class "B" Control Period. The Class "B" Control Period ends 30 years after the Declaration is recorded or when the Class "B" member so determines. The Declarant is the sole Class "B" member until the Class "B" membership terminates, which occurs two years after termination of the Class "B" Control Period or when the Class "B" member so determines and declares in a recorded instrument. The Bylaws provide that, during the Class "B" Control Period, the Board shall consist of three to five directors and that the directors shall be selected by the Class "B" member. Once the Class "B" membership terminates, the Class "A" members, defined as all parcel owners, are entitled to elect all directors to the Board.

Homelife contends that HRB, as Declarant, was required to appoint at least three directors to the Board, and that its failure to do so meant that the Board was

improperly appointed. The Association responds that the Class "B" Control Period ended when U. C. Realty Corp. so determined, which occurred when it sold 51% of its property in the development; that the Class "B" membership terminated two years thereafter; that HRB therefore had no responsibility for appointing directors during the time period at issue; and the directors were instead elected by the Class "A" members.[3]

Homelife also contends that the Board was elected without a quorum because Mitchell admits that attendance at Association meetings "can be minimal and at times does not reach a quorum of twenty-five percent (25%) of the total Class A Members, so that a mail in or proxy vote is often used." The Association's Bylaws, however, provide that "[a]t all meetings of the Members, Members may vote in person . . . or by proxy, subject to the limitations of State of Georgia law."

Homelife further contends that the Association has failed to follow the requirements for nominating directors to the Board by failing to utilize a formal nominating committee. Section 3.4 of the Bylaws provides that "[e]xcept with respect

---

[3] The Association's brief is somewhat unclear on this point, but the essence of its position, based in part on communications between Mitchell and a principal with the former Declarant, U. C. Realty Corp., appears to be that when HRB assumed all duties and obligations of U. C. Realty Corp. as Declarant in 2003, the Declarant was no longer responsible for appointing directors to the Board.

to directors selected by the Class "B" member, nominations for election to the Board shall be made by a Nominating Committee." That same section provides that nominations shall also be permitted from the floor, which is consistent with how the Association asserts that it has obtained such nominations.

Finally, Homelife contends that the Association failed to give proper notice of meetings of the Board as required by Section 3.14 of the Bylaws, which requires that notice of Board meetings shall be posted at least 48 hours in advance of the meeting at a conspicuous place within the [property subject to the Declaration]," and that Homelife received no notice of the meetings of the Board. Mitchell testified that he did not recall having separate meetings of the Board of Directors, but instead that Association business was conducted at the annual membership meeting, and that notice of those meetings was given in accordance with the Bylaws.

Construing the record in the light most favorable to the Association, the nonmovant on this claim, we conclude that issues of fact remain as to whether the Association complied with the terms of the Declaration and the Bylaws with respect to appointing and electing directors to the Board and providing notice of meetings. Accordingly, the trial court did not err in denying Homelife's motion for summary judgment on its claim that the assessments at issue were invalid. See generally

17

*Skylake Property Owners Assn. v. Powell*, 281 Ga. App. 715, 720 (2) (637 SE2d 51) (2006).

5. Homelife contends that the trial court erred in failing to find that the Declaration precludes the Association's claim for unjust enrichment.

"The doctrine of unjust enrichment applies in the absence of a written contract between parties; where such a contract exists, however, it is the contract that governs the dispute and neither party can rely on the doctrine of unjust enrichment." *S-D RIRA, LLC*, 330 Ga. App. at 452 (3) (b). We have determined that the Homelife properties are subject to the easements, restrictions, covenants, and conditions in the Declaration. Thus, the Association's claims in this case are governed by the relevant contractual documents, including the Declaration, Bylaws, and the deeds in the chain of title, and unjust enrichment is inapplicable. See id. Accordingly, Homelife is entitled to summary judgment on this claim.

6. Homelife contends that the trial court erred in finding or suggesting that the Association has a viable claim for recovery of attorney fees because Homelife's positions in this case lack merit, are frivolous, and lack a good faith basis. The trial court, however, specifically deferred ruling on the potential offsetting claims for attorney fees. "Where there is no final ruling upon an issue by the trial court, there is

nothing for the appellate court to pass upon, for this court is a court for the correction of errors made in the trial court." (Citation and punctuation omitted.) *Mayo v. City of Stockbridge*, 285 Ga. App. 58, 62-63 (5) (b) (646 SE2d 79) (2007). Accordingly, this contention presents nothing for our review.

7. The Association contends that the trial court should have ruled on its motion to dismiss Homelife on Glynco's slander of title claim. "The general rule is that an appellee must file a cross-appeal to preserve enumerations of error concerning adverse rulings." (Citations and punctuation omitted.) *Coen v. Aptean, Inc.*, 346 Ga. App. 815, 826 (4) (816 SE2d 64) (2018). An appellate court may, however, consider "a ruling that becomes material to an enumeration of error urged by an appellant." (Citation and punctuation omitted.) Id. The Association's slander of title argument is not material to any enumeration of error argued by Homelife. As a result, we will not consider the Association's argument without the required cross-appeal.

*Judgment affirmed in part and reversed in part. McFadden, P. J., and Ray, J., concur*.